IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

FILED
09/03/2021
Clerk of the
Appellate Courts

## ROBERT DERRICK JOHNSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 17752    M. Wyatt Burk,  Judge**

---

### No. M2019-01849-CCA-R3-PC

---

The Petitioner, Robert Derrick Johnson, appeals as of right from the Bedford County Circuit Court's denial of his petition for post-conviction relief, wherein he challenged his conviction for robbery.  On appeal, the Petitioner asserts that he received the ineffective assistance of trial counsel because counsel failed to (1) advise him of a statutory right to at least fourteen days to prepare for trial, see Tennessee Code Annotated § 40-14-105; (2) file a motion to continue the trial; (3) suppress the victim's in-court identification of the Petitioner; (4) file a motion or object at trial to the destruction of video-recorded evidence; and (5) challenge the Petitioner's second trial as violative of double jeopardy.  The Petitioner also contends that the post-conviction court erred by striking his pro se amendment to the post-conviction petition.   Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ. joined.

Joseph C. Johnson (at post-conviction hearing and on appeal), Fayetteville, Tennessee; and Christopher Westmoreland (for pre-hearing filings), Shelbyville, Tennessee, for the appellant, Robert Derrick Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

## I.     Trial and Direct Appeal

The Petitioner was convicted by a Bedford County jury of robbery and sentenced to ten years as a Range II, multiple offender related to the March 22, 2013 robbery of Kasey Vincent, a cashier at Wedge Market.  State v. Robert Derrick Johnson, No. M2015-02516-CCA-R3-CD, 2018 WL 5810017, at *1 (Tenn. Crim. App. Nov. 6, 2018).

During the Petitioner's April 13, 2015 trial, one of the State's witnesses, Detective Sam Jacobs was hospitalized and consequently, he was unable to testify.  Johnson, 2018 WL 5810017, at *1.  The State requested a mistrial, which the Petitioner opposed.  The trial court granted a mistrial without prejudice after finding that it was necessary in order for both parties to receive a fair trial and that Detective Jacobs' unavailability was not Detective Jacobs' fault nor the State's.

Before the Petitioner's retrial, the assistant public defender appointed to the Petitioner's case filed a motion to withdraw due to a conflict of interest involving a potential trial witness who had been represented by the Public Defender's Office.  Johnson, 2018 WL 5810017, at *1.   Trial counsel was appointed on April 28, 2015.  The second trial occurred on May 11 and 12, 2015, after which the Petitioner was convicted as charged.  The trial court appointed appellate counsel after the motion for a new trial hearing due to the Petitioner's "questions about the competence of" trial counsel and his desire for trial counsel to withdraw.

On direct appeal, the Petitioner raised a speedy trial issue and contended that the trial court improperly declared a mistrial in his first trial.  Johnson, 2018 WL 5810017, at *2.  After concluding that the notice of appeal had been filed late through no fault of the Petitioner, this court waived timely filing in the interests of justice.  Relative to the mistrial issue, this court concluded that it had been waived for failure to raise it in the trial court and that plain error review was unwarranted.  Id. at *3.  Relative to the speedy trial issue, this court noted that it was not waived, but concluded that the Petitioner was not entitled to relief.  Id. at *4-5.

## II.     Post-Conviction Proceedings

On March 7, 2019, the Petitioner filed a pro se petition for post-conviction relief and a document entitled "Support Grounds," which detailed several allegations of ineffective assistance of counsel, a double jeopardy violation, and due process violations. After first post-conviction counsel was appointed, the post-conviction court entered an April 26, 2019 order establishing a deadline of May 24, 2019, to file an amended post-conviction petition.  On July 15, 2019, the Petitioner filed a pro se amendment to his

petition, wherein he averred that first post-conviction counsel refused to "cooperate" with the Petitioner and file the amendment as requested. The amendment added additional grounds for ineffective assistance. On July 16, 2019, the State filed a motion to strike the amendment, and on July 19, 2019, first post-conviction counsel filed a motion to withdraw. On July 23, 2019, the post-conviction court granted the motion to withdraw and appointed second post-conviction counsel. On August 19, 2019, the post-conviction court granted the motion to strike the amendment, noting that the Petitioner was represented at the time he filed the pro se amendment and that it was filed after the post-conviction court's stated deadline.

At the September 12, 2019 post-conviction hearing, the trial judge testified that he had retired in 2017 and that he presided over both of the Petitioner's 2015 trials. He stated that the Petitioner was represented by the Public Defender's Office in the first trial and that halfway through the first day of trial, the case was "mistried" because a witness had "a heart issue." After the mistrial, the Public Defender's Office moved to withdraw due to a conflict of interest, and the trial judge appointed trial counsel. The trial judge estimated that he appointed trial counsel about two weeks before the second trial.

The trial judge testified that after he appointed trial counsel, he wrote a letter to both parties and the Public Defender's Office offering to continue the second trial if trial counsel felt he could not be ready. The trial judge explained that although he was generally reluctant to continue jury trials "at the last minute," he wanted to convey to the parties that he would be "perhaps less draconian than [he] usually was" due to the "exceptional situation." The trial judge noted that he took into consideration trial counsel's being new to the case, as well as the possibility that the ill witness might not recover sufficiently to testify in the second trial.

The trial judge's letter, which was received as an exhibit, was dated April 28, 2015, and addressed to the prosecutor, the public defender, and trial counsel. The letter read as follows:

> It looks as though the PD's Office now has a conflict in representing [the Petitioner] on May 11. I doubt seriously that we can go ahead with a trial on that date. I would like to appoint [trial counsel] to represent the [Petitioner] in the place of the PD's Office if everyone is agreeable.
>
> If [trial counsel] could go to trial on May 11, I would be delighted, but I do not see that happening. Anyone have June 15 available? Just let me know. Thanks.

A copy of the trial judge's April 28, 2015 order appointing trial counsel was also received as an exhibit. The order noted that "the trial will proceed as scheduled on May 11, 2015, unless newly appointed counsel feels that he cannot proceed at this time[.]" When asked whether he expected trial counsel to request a continuance, the trial judge responded, "Not necessarily. If I thought it was inevitable, I would have just gone ahead and rescheduled it myself."

The trial judge testified that trial counsel was "one of the most energetic attorneys [he had] ever dealt with" and that counsel was "bound to be aware" that the Petitioner was concerned about the lengthy period of time it had taken for his case to go to trial. The trial judge noted that the Petitioner raised a speedy trial issue in the direct appeal of his conviction and that at the first trial, the judge believed that the Petitioner objected to the mistrial. The trial judge stated that although he did not know whether trial counsel would have enough time to prepare for the second trial date, he knew that original counsel, an assistant public defender, was "a set piece General" who had "everything ready in meticulous detail" and had "talked to everyone, or his investigator ha[d.]" The trial judge added that original counsel kept "meticulous notes on everything that everyone has said," that original counsel was a "master of dealing with discovery," and that trial counsel had "the benefit of all that."

The trial judge testified that to his recollection, trial counsel "almost immediately" drove to Memphis, where the Petitioner was incarcerated, to meet with him. The trial judge noted that although he could not "post-judge" a motion that was never argued, trial counsel's assertion that he needed more time would have been "a strong argument" in favor of continuing the trial. The trial judge said that any pretrial motions were argued during original counsel's representation of the Petitioner. The trial judge stated that the trial may have been trial counsel's first and that he recalled thinking, "[W]ow, what a first trial. He did a great job[.]"

On cross-examination, the trial judge testified that original counsel "did an excellent job" representing the Petitioner and that original counsel, who had tried many cases in the trial judge's court, was "truly, truly exceptional." The trial judge stated that although he had less experience with trial counsel, he had never seen trial counsel "fall below the applicable standard." He noted that trial counsel "often [went] way beyond that standard in preparing and in communicating with his clients." The trial judge praised trial counsel's ability to communicate unfavorable news to clients and his manner "of approaching clients very humbly and explaining to them why he believes they need to do what they need to do." The trial judge said that trial counsel had always been honest with the court and was "quite skilled" in his presentation of cases.

The Petitioner testified that after Detective Jacobs became ill during the first trial, the State continued presenting witnesses and "stuck someone" in Detective Jacobs' place. The State requested a mistrial the next day, and the Petitioner communicated to original counsel that he was opposed to it. The Petitioner remarked that he wanted to "continue with that [j]ury because [he] saw where it was going." The Petitioner averred that "they" took him into a room and asked him to accept a plea offer, which he declined.

The Petitioner testified that after the mistrial was granted, he did not know for an unspecified period of time that original counsel withdrew. The Petitioner stated that he met trial counsel on Monday, May 4, 2015, when counsel visited him in prison. The Petitioner said that trial counsel visited him for one and one-half hours and informed him that they were going to trial the following Monday. They spoke about the Petitioner's "displeasure [with] the previous attorney and what had taken place" at the first trial, the Petitioner's concern that prospective jurors of color had been dismissed during voir dire, and the victim's inconsistent identifications of the perpetrator. The Petitioner thought he recalled trial counsel's stating that he would listen to an audio recording of the first trial. The Petitioner denied that trial counsel discussed a motion to suppress or double jeopardy issues.

The Petitioner testified that by Wednesday of that week, he became concerned because he had not been transported to the local jail in advance of trial. He asked his mother and girlfriend to contact trial counsel, and trial counsel visited him on Friday for one hour and ten minutes. The Petitioner stated that the purpose of the meeting was to "[b]ecome a little more familiar with one another, and mak[e] sure he was getting prepared[.]" When asked whether he felt trial counsel was prepared, the Petitioner responded that it was the second time he had ever seen trial counsel and that he "could only go on what [he] had been told by" trial counsel.

The Petitioner testified that in his pro se post-conviction petition, he raised several grounds of ineffective assistance of counsel. He stated that pursuant to Tennessee Code Annotated section 40-14-105, he was entitled to fourteen "full days . . . after an arrest and return of indictment . . . before being tried for an offense." The Petitioner stated that his case was trial counsel's first jury trial and insinuated that the prosecutor had an advantage after performing a "trial run" of the case. The Petitioner said that he was "calling into question the days to prepare [and] the time limit to prepare for this trial" and that he knew trial counsel was insufficiently prepared.

Next, the Petitioner testified that trial counsel should have challenged the victim's identification of him in court. He noted that during a photographic lineup near the time of the incident, the victim circled "somebody" and wrote "not 100 percent sure." He stated that the only description the victim consistently gave of the perpetrator was that the person

was five feet, ten inches tall. The victim did not identify the Petitioner at the preliminary hearing, and she stated only that the perpetrator's face was covered. However, the victim identified the Petitioner in court during the first trial. The Petitioner opined that "it was suggestive from day one, during the interviews, during the investigation," and that trial counsel "should have looked into the possibility of her." The Petitioner stated that he brought up the identification during his first meeting with trial counsel and that he provided trial counsel with the preliminary hearing transcript during their second meeting. He denied that trial counsel filed a motion to suppress the identification or that trial counsel informed him about any pretrial motions.

Relative to the surveillance recording of the incident, the Petitioner testified that the "same camera" showed the perpetrator enter the store, but it did not show him exit. The Petitioner said that a height marker was present beside the front door such that the camera angle would have revealed the perpetrator's height. The Petitioner averred that the "camera angle ceased to exist" and that he was unaware of this fact until trial counsel "brought it up" during the second trial. The Petitioner stated that trial counsel should have addressed the missing camera footage before trial and that it was "not an issue that [the Petitioner] would have waived had [he] known it exist[ed]"

Relative to his double jeopardy issue, the Petitioner testified that he opposed the mistrial in the first trial and that he informed trial counsel of this fact. The Petitioner stated that the State never established a manifest necessity for the mistrial. He noted, though, that he did not learn about the manifest necessity requirement until one year before the post-conviction hearing. The Petitioner denied that trial counsel raised a double jeopardy issue.

Relative to the pro se amendment, the Petitioner testified that he declined to speak with the police after he was arrested and read his Miranda rights. At trial, the prosecutor asked Detective Jacobs if the Petitioner provided an alibi to police. During closing arguments, the prosecutor reiterated that the Petitioner had not provided an alibi. The Petitioner stated that trial counsel should have objected; he noted, though, that counsel did object "several minutes later." According to the Petitioner, the trial court asked trial counsel what relief he was seeking, and counsel replied, "Oh, I'm not seeking any relief." The Petitioner added that during closing arguments, the prosecutor "made reference to" the Petitioner's right to remain silent. According to the Petitioner, trial counsel chose not to object and said, "[M]aybe I'm making a novice mistake[.]"

At this juncture, the State objected and argued that this issue was only included in the pro se amendment to the post-conviction petition, which the post-conviction court had stricken. The State noted that the Petitioner "[was] trying to go ahead and have that litigated, despite the [c]ourt's ruling." Post-conviction counsel responded that if issues arose during the hearing, the Petitioner could testify to them. The post-conviction court

found that "out of an abundance of caution" it would allow the testimony and that it would reserve judgment on whether to consider the issue on its merits or maintain its earlier ruling.

Although the trial transcript was not included in the record on appeal, the Petitioner's pro se amendment contained what appear to be relevant portions of the transcript. The amendment reflects that during direct examination, the prosecutor asked Detective Jacobs whether the Petitioner gave an alibi during his police statement and whether the Petitioner made inculpatory statements. Detective Jacobs responded negatively to both questions and agreed that the Petitioner declined to speak with him. On cross-examination, trial counsel elicited from Detective Jacobs that the Petitioner had a constitutional right not to speak with him or give an alibi. Likewise, an excerpt of closing arguments reflected the prosecutor's discussion that the Petitioner had provided no alibi. The prosecutor noted that the offense occurred on New Year's Eve and that in light of the holiday, the prosecutor considered it "pretty important" that the Petitioner "never offered up an alibi" or an "explanation . . . as to where he was." Trial counsel argued in closing that the Petitioner was not required to present any proof.

During a jury-out hearing or recess after closing arguments, trial counsel raised an objection to the prosecutor's discussion of a lack of alibi, arguing that the State was attempting to shift the burden of proof to the Petitioner. The trial court asked trial counsel what relief he sought; although trial counsel initially requested no relief and stated that he was merely preserving the issue for appeal, he continued to request a curative jury instruction:

> [Trial Counsel]: I'm not seeking a relief, other . . . than making the objection for the record that it was . . . addressed an[d] I'm objecting. If I didn't object, I . . . wouldn't have [any] recourse on appeal. And if I'm making . . . a novice move –
>
> THE COURT: Well, and I'm not familiar with . . . an objection where there's not some relief sought . . . explicitly or implicitly.
>
> . . . .
>
> [Trial Counsel]: I would request that an . . . additional instruction be made referring to that . . . [a]llusion in closing.

The trial court disagreed that the State's discussion of an alibi was a comment on the Petitioner's right not to testify and stated that it would give the standard jury instruction on the burden of proof.

On cross-examination, the Petitioner testified that during his first meeting with trial counsel, he told trial counsel everything he knew about the case. The Petitioner stated that he had no paperwork with him during the first meeting because he did not know trial counsel was coming to see him. When the prosecutor remarked that the Petitioner "[had] a brain in [his] head" to recall the witnesses' testimony in the first trial, the Petitioner responded, "And truth be told, I love to smoke marijuana, too." The Petitioner stated that trial counsel was "just then starting to listen" to the recording of the first trial and that trial counsel was unable to tell the Petitioner "what he knew up to that point[.]"

The Petitioner stated that trial counsel "played hell trying to get to visit" him, and he agreed that trial counsel "got there in short order" in spite of the three-hour drive to the prison. He also agreed that trial counsel had the benefit of hearing the recorded witness testimony in the first trial. The Petitioner stated that he told trial counsel about the surveillance recording's being "herky jerky" and "hard to make out." The Petitioner clarified that the video did not "play smoothly" and that the audio did not sync up with the video. The Petitioner denied asking trial counsel to continue the second trial date or knowing that he could request a continuance. Trial counsel told him that the trial would occur on May 11 and that trial counsel was ready. The Petitioner said that he "[went] on what this lawyer [told] me." The Petitioner acknowledged that his first trial had been continued several times; however, he averred that at the time, he believed the State had requested the continuances, not original counsel.

The Petitioner testified that at the second meeting, he and trial counsel discussed the testimony at the first trial and the surveillance recording. He denied that trial counsel told him the strengths and weaknesses of the State's case. The Petitioner agreed that from the beginning, he claimed that he had not committed the robbery and that it was a case of mistaken identity. He also agreed that attacking the victim's identification of him or proving an alibi were methods of creating reasonable doubt for the jury.

The Petitioner testified that the victim identified a dark-skinned[1] individual in a photographic lineup as the perpetrator and that the Petitioner's photograph was not included in the lineup. He stated that the victim indicated in a handwritten note on the lineup that she was uncertain about the identification. The Petitioner agreed that the lineup identification was favorable to his defense, but he maintained that his due process rights were violated because the victim was permitted to identify him in court. He noted that at the preliminary hearing, the victim testified that she did not see the perpetrator's facial features. The Petitioner stated that the victim identified him in court during the first trial. The Petitioner averred that if trial counsel had interviewed the victim before the second trial, he would have known that she was going to identify the Petitioner on the stand. The

---

[1] The Petitioner described himself as "light skinned."

Petitioner agreed that the jury was presented with the victim's initial identification, her in-court identification, and the surveillance footage.

Relative to the allegedly missing portion of the surveillance recording, the Petitioner stated that trial counsel addressed it in his argument to the jury. The Petitioner disagreed that making this argument was an effective way to create reasonable doubt. The Petitioner reiterated that the missing recording would show that the perpetrator was shorter than the Petitioner, which would have absolved him of guilt. The Petitioner did not recall whether trial counsel argued the difference between the victim's description of the perpetrator's height, which was five feet, ten inches, and the Petitioner's height, which was six feet, three inches.

Relative to the mistrial, the Petitioner opined that trial counsel should have challenged whether it was properly granted and whether a retrial could occur in light of double jeopardy principles. The Petitioner agreed that before the first trial, he objected to at least one continuance and that he wanted a speedy trial. He also agreed that the second trial was held too quickly. The Petitioner denied that he called trial counsel the "white Johnny Cochran."

On redirect examination, the Petitioner testified that trial counsel told him that he was going to interview all of the trial witnesses. The Petitioner opined that the second trial transcript reflected that trial counsel "didn't know what [the witnesses] were going to say" and that he was "winging it." The Petitioner denied that trial counsel "investigated anything."

Trial counsel testified that at the time of the hearing, he was employed by the District Attorney's Office for the 17th Judicial District. Trial counsel stated that he was sworn in as an attorney in fall of 2013 and that as of 2015, he was working in private practice. Trial counsel said that he was appointed to the Petitioner's case on April 28, 2015, and that the trial occurred about two weeks later on May 11 and 12, 2015. Trial counsel denied that he considered filing a motion to continue the trial. He explained that he "had a distinct advantage" of listening to the recording of the first trial four times, including the witnesses' testimony and the State's opening argument, that he interviewed potential witness "Luvell Kinney," and that he investigated and discovered "really good, juicy stuff" about the victim, such as her "possible memory issues." Trial counsel arranged to visit the Petitioner as soon as possible and met with him twice at the prison. Trial counsel noted that he was "slated" to meet with the Petitioner on Saturday and Sunday before the trial but that "[t]here were no other issues for [them] to go over." Trial counsel described himself as "saturated with preparedness."

Trial counsel testified that soon after his appointment to the Petitioner's case, he met with the Public Defender's Office and obtained "their entire file." He stated that the file included work product and notes, as well as more information than "normal attorneys" would receive in discovery, which he attributed to a good working relationship between the District Attorney General's Office and the Public Defender's Office. Trial counsel spoke to original counsel and "thoroughly" reviewed the discovery materials and the surveillance recording. Trial counsel estimated that he worked on the Petitioner's case between eight and sixteen hours each day before the trial.

Trial counsel testified that he chose not to file pretrial motions because "anything that [he] felt was worthy of a motion in limine, [he] actually used at trial to confuse the [j]ury . . . and seed reasonable doubt." He noted that he "had the luxury of looking" at the pretrial motions original counsel filed and their reasoning. Trial counsel affirmed that he had "more than enough" time to investigate, research, and file any necessary motions.

Trial counsel testified that the Petitioner's trial was his first, although he had represented "numerous" defendants in preliminary and pretrial motion hearings. Trial counsel noted that he was "two years out of being hyper prepared for the Bar exam, which [trial counsel] blew away." Trial counsel noted that he "did more preparation than anyone else" he knew and that "the law was fresh, still fresh after two years." He stated that with original counsel's work and his having listened to the first trial, he was "surprised by nothing."

Relative to the surveillance recording, trial counsel testified that he was the first person to notice that the recording omitted some camera angles. He stated that he noticed the missing angles during the second trial and that he "capitalized" upon it by challenging the chain of evidence and cross-examining the police witness about why the recording was incomplete. Trial counsel argued to the jury that the State was "trying to hoodoo" them and that he used the omission to create reasonable doubt. Trial counsel denied requesting a jury instruction regarding missing evidence, although he did not recall whether he thought at the time that such an instruction would have been appropriate.

Trial counsel testified that he spoke informally with Detective Jacobs before the second trial; he did not recall interviewing the victim, Officer Cody Swift, Officer Mike Baker, or Detective Brian Crews. Trial counsel noted that he had already heard "their" testimony and was "loaded for bear with cross-examination questions." Trial counsel denied that interviewing the witnesses who testified in the first trial would have been helpful.

Trial counsel denied that the Petitioner ever mentioned a double jeopardy issue or that trial counsel ever perceived such an issue. Trial counsel acknowledged discussing the

-10-

mistrial with the Petitioner during their first meeting. Relative to the circumstances of the mistrial, trial counsel did not think it was necessary to research a possible double jeopardy issue because the jury had not retired to deliberate and the State did not "fake" Detective Jacobs' heart attack. Trial counsel opined that the mistrial was "the province of [the Petitioner's] prior attorneys." When asked whether he had a duty to investigate the issue upon his appointment, trial counsel responded, "Well, the trial didn't – it stopped. I didn't pick[ up] any banter about mistrials or try to argue . . . that there was a double jeopardy issue." He averred that he had "plenty of time" to perform any needed legal research before the trial.

Relative to his meetings with the Petitioner, trial counsel testified that he did not review the surveillance recording during the first meeting. He discussed trial strategy with the Petitioner during the second meeting. Trial counsel stated that the Petitioner discussed calling another witness; however, after trial counsel "warned [the witness] about perjury, she declined to testify." Trial counsel noted that the witness was "waiting downstairs" and that he could have issued a subpoena to secure her testimony. He stated, though, that he believed it would not "look good" if the Petitioner called a witness "who refused to say something to the [j]ury, especially given his relationship to that witness."

Trial counsel testified that he objected to a statement the prosecutor made during opening or closing arguments. Trial counsel said that the trial court immediately issued an instruction to the jury about "the burden of proof and who had it," which counsel considered to be curative.

Trial counsel testified that he wrote for the Petitioner a list of possible issues for the direct appeal and a post-conviction petition. Trial counsel told the Petitioner that he could not argue ineffective assistance of counsel against himself. The list, which was introduced as an exhibit, included the short interval between trial counsel's appointment and the trial, the trial court's appointing an attorney with no trial experience, trial counsel's failure to enter credit card records as an exhibit, an issue involving opening argument, and trial counsel's failure to call the Petitioner's girlfriend as a witness. Trial counsel opined, though, that the Petitioner "had an outstanding trial," that the jury deliberated for "quite a while," that trial counsel "provided a blistering cross-examination" of an expert witness, that trial counsel had raised reasonable doubt regarding the surveillance recording, and that trial counsel was surprised by the guilty verdict.

On cross-examination, trial counsel agreed that original counsel "very freely" told him about the case, including the strengths and weaknesses of the evidence. Trial counsel noted that he had good hearing and that when he listened to the "hot mic" recording of the first trial, he heard everything spoken in the courtroom, even during recesses. Trial counsel stated that he "was looking for" any evidence the State might present that was not included

in the first trial. He noted that if a witness provided inconsistent testimony, the witness would have been subject to impeachment using his or her statements under oath in the first trial.

Trial counsel testified that depending upon its contents, the missing angle of the surveillance recording could have been favorable or unfavorable to the Petitioner's defense. He stated that he "was happy with" arguing to the jury that the recording was incomplete and that he "may have even come as close as [he] could to the precip[ice] of saying that the State was doing something nefarious without actually offending the [j]ury."

Trial counsel testified that as a result of his pretrial witness interviews, he discovered that the victim had prior drug-related charges. He recalled having a jury-out hearing at the second trial on this subject. Trial counsel also interviewed Angela Green, the Petitioner's "paramour," and stated that after warning her that she could not "just make up an alibi," trial counsel or the Petitioner decided not to call her as a witness.

Trial counsel testified that during the second trial, he realized that he only received the second page of a two-page credit history[2] from the State. He said that he raised the issue in court, that he "was very upset," and that the trial court had to "intervene in ruling on that" because "it was quite heated."

Relative to the handwritten list of post-conviction issues, trial counsel testified that a portion of the list not included in the exhibit contained suggested issues for the direct appeal. He denied that the list of post-conviction issues was an "admission of ineffectiveness," and he characterized it as his "going above and beyond" to ensure that the Petitioner was informed and comfortable.

The post-conviction court made oral findings of fact and later issued a written opinion denying post-conviction relief. Relative to the Petitioner's claim that the short interval between trial counsel's appointment and the second trial violated Tennessee Code Annotated section 40-14-105, the post-conviction court found that no violation occurred because the Petitioner was not indicted and tried within fourteen days. Insomuch as the Petitioner alleged ineffective assistance relative to trial counsel's preparation, the post-conviction court found that trial counsel was "effectively handed the State's playbook in audio form," an "extraordinary tool" not available to most defense attorneys. The post-conviction court noted that trial counsel also had "immense" information available from original counsel, a very experienced assistant public defender who met with trial counsel immediately after he was appointed. The post-conviction court credited trial counsel's testimony that he spent between eight and sixteen hours per day preparing for the

---

[2] Through context, it was apparent that trial counsel referred to the Petitioner's credit history here.

-12-

Petitioner's trial, that trial counsel listened to the audio recording of the trial four times, and that trial counsel would have asked for a continuance if he needed one. The post-conviction court found that both trial counsel and the Petitioner felt comfortable after their second meeting and that trial counsel was willing to meet with the Petitioner during the weekend if necessary. The post-conviction court found that no evidence presented at the second trial surprised trial counsel. The post-conviction court concluded that trial counsel was not deficient in his preparation.

Relative to the victim's in-court identification of the Petitioner, the post-conviction court found that trial counsel made a tactical decision to discredit the victim by discussing her inconsistent identification in the photographic lineup. The post-conviction court noted that the jury instruction on identification included that the jury could consider instances in which a witness failed to identify the Petitioner, as well as inconsistent identifications. The post-conviction court stated that trial counsel's strategy supported the defense theory of the Petitioner's innocence and that the jury could identify the Petitioner by watching the surveillance recording.

Relative to the missing camera angles, the post-conviction court found that no proof was presented to suggest that the State acted in bad faith or possessed any recordings apart from those provided to original counsel. The post-conviction court also found that the State had no duty to preserve the alleged evidence because no proof indicated that the State knew the theoretical recording was exculpatory before it was lost or destroyed.[3] Likewise, no evidence was presented that the Petitioner was unable to obtain comparable evidence. The post-conviction court found that trial counsel made a tactical decision to discuss the missing camera angles in order to discredit the police witness who testified about the recording's contents and plant seeds of reasonable doubt. The post-conviction court stated that the issue of the missing recording was "hotly litigated" by trial counsel. The post-conviction court noted that the disparity between the victim's description of the perpetrator's height and the Petitioner's height was evident by looking at the Petitioner in the courtroom.

Relative to the mistrial, the post-conviction court noted that the Petitioner claimed that trial counsel "and/or" original counsel erred by failing to raise the issue of manifest necessity. The post-conviction court found that manifest necessity existed, that no good-faith basis existed to oppose the second trial on double jeopardy grounds, that the record indicated that Detective Jacobs was "acutely ill," and that no evidence suggested that the State fabricated Detective Jacobs' absence. The post-conviction court noted that original counsel had objected to and argued against a mistrial.

---

[3] See State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999).

Relative to the Petitioner's pro se amended petition, the post-conviction court stated that it would consider the issue related to closing arguments "as a backstop," although in its opinion it was not required to do such. The post-conviction court found that the prosecutor made no improper comment on the Petitioner's right not to testify and that the prosecutor was permitted to discuss statements the Petitioner made before invoking his Fifth Amendment rights. The post-conviction stated that the jury was presumed to follow the trial court's instructions and that the jury instructions were "saturated" with the State's burden of proof, as well as instructions that closing arguments were not evidence and to place no significance on the Petitioner's decision not to testify.

The post-conviction court concluded generally that trial counsel's performance was not deficient and that even if trial counsel rendered deficient performance, the Petitioner was not prejudiced. After the post-conviction court denied relief, the Petitioner timely appealed.

ANALYSIS

On appeal, the Petitioner asserts that he received the ineffective assistance of trial counsel because counsel failed to (1) advise him of a statutory right of at least fourteen days to prepare for trial, see Tennessee Code Annotated § 40-14-105; (2) file a motion to continue the trial; (3) file a motion to suppress the victim's in-court identification of the Petitioner; (4) file a motion or object at trial to the loss or destruction of the surveillance camera recording; and (5) challenge the Petitioner's second trial as violative of double jeopardy. The State responds that the post-conviction court properly determined that trial counsel did not render ineffective assistance and that the pro se amendment was properly stricken.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether

that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

## I.    *Ineffective Assistance of Counsel*

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel.  Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)).  When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial.  Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 688-89.  In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id.  "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).  Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation.  Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim."  Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).  The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution.  State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

### a) *Failure to advise the Petitioner of fourteen-day requirement*

Tennessee Code Annotated section 40-14-105 provides that "[e]very person accused of any crime or misdemeanor whatsoever shall be entitled to fourteen (14) full days, Sundays and legal holidays excluded, after arrest and the return of the indictment or

presentment before being tried for the offense." We note for the benefit of the Petitioner that this statute only applies to the interval between an arrest/indictment and the trial. It does not apply to the time between a first trial ending in a mistrial and a second trial. The Petitioner was indicted on November 18, 2013, and his first trial was held on April 13, 2015; consequently, no violation of Code section 40-14-105 occurred. Trial counsel was not deficient for failing to advise the Petitioner of a nonexistent statutory violation. The Petitioner is not entitled to relief on this basis.

### b) Motion to continue

The Petitioner avers that trial counsel should have requested a continuance and that trial counsel was not prepared for the second trial. The post-conviction court credited trial counsel's testimony regarding the long hours he worked to prepare for the second trial. The Petitioner and trial counsel testified consistently regarding the length of their two visits and counsel's access to the recording of the first trial. The trial judge testified that trial counsel did an "excellent" job in the Petitioner's trial, and the trial judge noted that original counsel kept a meticulous file, which original counsel provided to trial counsel in its entirety. Trial counsel testified that in addition to listening to the recording of the first trial multiple times and speaking to the Petitioner, he interviewed two potential witnesses and discovered that the victim had a history of drug charges and memory problems. Trial counsel noted that he was not surprised by any evidence at the second trial, and he and the trial judge remarked that counsel had access to valuable and unusual information about the State's case as a result of the first trial.

Although trial counsel provided the Petitioner with a handwritten list of potential appellate and post-conviction issues, he testified that the list was not an admission that he believed he provided ineffective assistance. We agree with the post-conviction court that trial counsel was amply prepared and that his performance was not deficient in this regard.

### c) Victim's in-court identification

The Petitioner contends that trial counsel should have filed a motion to suppress the victim's in-court identification of him as the perpetrator. Trial counsel testified that as part of the defense strategy, he attacked the victim's credibility regarding her inconsistent identifications. The victim made a contemporaneous, tentative identification in a photographic lineup in which the Petitioner was not included, and she did not identify the Petitioner in court during the preliminary hearing. Trial counsel sought to utilize the inconsistencies to create reasonable doubt in the minds of the jury as to the identity of the robber. We agree with the post-conviction court that this was a reasonable tactical decision

based upon adequate preparation.  Trial counsel was not deficient for choosing not to object to the victim's in-court identification, and the Petitioner is not entitled to relief on this basis.

### d) Missing surveillance camera angle(s)

The Petitioner contends that trial counsel rendered ineffective assistance for failing to file a Ferguson motion regarding the missing camera angle that would have shown the perpetrator exiting the market, thereby documenting the person's height.  The Petitioner argues that if the perpetrator were five feet, ten inches tall, as described by the victim, he would be exonerated.

We agree with the post-conviction court that the Petitioner has not established that the relevant recording existed, that the State possessed it, that the recording had evident exculpatory value, or that the State lost or destroyed it.  We note that when a petitioner raises a post-conviction issue regarding the failure to discover, obtain, or present evidence, the petitioner should obtain and present the evidence at the post-conviction hearing.  See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).   This court may not speculate on the contents of a hypothetical recording.

At any rate, trial counsel stated that he realized during the second trial that the surveillance camera did not depict the perpetrator's exit.   Trial counsel decided to emphasize the recording's incompleteness in an effort to discredit the police witnesses on the stand and to portray the State in a negative light.  We agree with the post-conviction court's finding that trial counsel made an informed, tactical decision and that trial counsel's performance was not deficient.   The Petitioner is not entitled to relief on this basis.

### e) Mistrial

The Petitioner contends that trial counsel[4] provided ineffective assistance by failing challenge the manifest necessity for the mistrial and raise double jeopardy objection before the second trial.  The post-conviction court found that no good-faith basis existed for such an objection and that manifest necessity existed.

---

[4] The Petitioner's post-conviction petition states that an unspecified "counsel" provided ineffective assistance in this regard, and the post-conviction court's opinion and the State's appellate brief both mentioned original counsel in their discussion of the mistrial issue.  However, the Petitioner does not discuss original counsel's performance in his appellate brief; accordingly, we will confine our analysis to trial counsel's performance.

We agree with the post-conviction court. Detective Jacobs' heart attack, and subsequent hospitalization, was an unforeseeable circumstance that occurred through no fault of either party or Detective Jacobs. In accordance with the Petitioner's wishes, original counsel argued against the mistrial, but the trial court found that a mistrial was necessary to ensure a fair trial for both parties. The decision to grant or deny a mistrial "is within the sound discretion of the trial court." State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); see State v. Jones, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). Moreover, this court considered the mistrial issue on direct appeal and concluded that plain error relief was unwarranted. Johnson, 2018 WL 5810017, at *2. Trial counsel was not deficient for lodging a meritless objection, and the Petitioner is not entitled to relief on this basis.

## II.     Pro Se Amendment

The Petitioner argues that the post-conviction court improperly struck his pro se amendment to the post-conviction petition, in which he raised an additional issue related to trial counsel's effectiveness. The State responds that the amendment was filed after the deadline imposed by the post-conviction court and that the post-conviction court ultimately considered the issue when the Petitioner orally raised it at the post-conviction hearing.

After first post-conviction counsel was appointed on March 22, 2019, he had a statutory period of thirty days within which to file an amendment. See Tenn. Code Ann. § 40-30-107(D)(2). On April 29, 2019, the post-conviction court extended that period and stated that it would accept any amendments filed before May 24, 2019. The Petitioner filed his pro se amendment on July 15, 2019, almost two months after the deadline. On August 19, 2019, the post-conviction court granted the State's motion to strike the amendment, noting that the Petitioner was represented at the time he filed the pro se amendment and that it was filed after the post-conviction court's stated deadline.

However, the post-conviction court correctly allowed the Petitioner to testify at the post-conviction hearing about the ineffective assistance issue raised in the amendment, and the court addressed the issue in its order. Tennessee Supreme Court Rule 28, section 8(D)(5) states, in relevant part, "If evidence is objected to on the basis that it concerns issues not raised in the petition or answer, the court may allow amendments and shall do so freely when the presentation of the merits of the cause will otherwise be subserved." The Petitioner's issue was duly considered by the post-conviction court, and he was not harmed by the post-conviction court's striking his pro se amendment. The Petitioner is not entitled to relief on this basis.

## CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE